# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
December 10, 2021

Lyle W. Cayce
Clerk

No. 21-20115

Cannon Oil and Gas Well Services, Incorporated,

*Plaintiff—Appellant*,

*versus*

KLX Energy Services, L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-cv-01164

Before Dennis, Higginson, and Costa, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:

Texas and Wyoming are leading oil-producing states.[1]  Like other leading energy states,[2] they both regulate the use of indemnity agreements in their oilfields with Anti-Indemnity Acts.  Wyoming, concerned that

---

[1] U.S. Energy Information Administration: Independent Statistics & Analysis, *Oil and Petroleum Products Explained*, https://www.eia.gov/energyexplained/oil-and-petroleum-products/where-our-oil-comes-from.php (last updated April 8, 2021) (ranking Texas first and Wyoming eighth).

[2] *See, e.g.*, La. Stat. Ann. § 9:2780; N.M. Stat. Ann. § 56-7-2.

indemnification disincentivizes safety, forbids oilfield indemnity agreements. Wyo. Stat. Ann. § 30-1-131. Texas, concerned that large oil companies will use their leverage to demand indemnity from independent operators, also disfavors the agreements. But it does not ban them entirely. To address the bargaining-power problem, it allows indemnification in limited situations including when the indemnity is mutual and backed by insurance. Tex. Civ. Prac. & Rem. §§ 127.003, 127.005.

This conflict between the Wyoming and Texas oilfield indemnity laws is the focus of this appeal. A contract for the leasing and servicing of drilling equipment includes a mutual indemnity agreement that complies with Texas law but would be unenforceable under Wyoming's blanket ban. Although the agreement states that Texas law will govern, most of the work performed under the contract occurred in Wyoming with none in Texas. And indemnity is being sought for a Wyoming lawsuit filed by a Wyoming resident injured in a Wyoming oilfield operated by a Wyoming business. We must decide whether the Texas or Wyoming Oilfield Anti-Indemnity Act applies.

I.

Cannon Oil and Gas Well Services is an oil-and-gas exploration company based in Wyoming. When Cannon needed to lease drilling equipment, it contracted with Texas-based KLX Energy Services.

The parties memorialized their deal in a "Master Equipment Rental Agreement," which governs "all Equipment rented . . . as well as any services provided by [KLX to Cannon]." The document includes three relevant provisions. The first is a choice-of-law clause providing that Texas law governs the agreement. Second is an indemnity provision under which Cannon and KLX must "protect, defend, [and] indemnify" each other against losses involving injuries sustained by the other's employees, regardless of who is at fault. The indemnity provision also notes in a separate

clause that each party's obligation "shall only be effective to the maximum extent permitted by applicable law." And third, the agreement anticipates that Cannon will on occasion place extra orders for rental equipment and maintenance services. To ensure its supremacy over such periodic orders, the Master Agreement states that if "there should be any conflict" with "any Order, purchase order, field ticket, work order, or any other type of memoranda," the Master Agreement controls.

The same day that Cannon signed the Master Agreement, it also executed a shorter document titled "Work Order." Like the Master Agreement, the Work Order purports to apply to "all services and rental equipment" that KLX provides to Cannon. It also includes an indemnity provision and choice-of-law clause selecting Texas law. But unlike the Master Agreement, the Work Order's indemnity provision does not include a separate clause limiting the parties' indemnity obligation "to the maximum extent permitted by applicable law."

Initial discussions about the agreement occurred entirely in Wyoming, where KLX maintains a significant presence. Cannon later executed the documents in Wyoming; KLX did so in West Virginia. During negotiations, KLX anticipated providing equipment and services only where Cannon did business—Colorado, Utah, Idaho, Montana, Nevada, and above all, Wyoming. KLX's expectations were warranted. From the time the parties struck their deal to when this case began, KLX issued 252 invoices to Cannon, 228 of which came from Wyoming work. KLX never invoiced Cannon for work in Texas.

The incident that launched this dispute occurred two years later. An employee from KLX's Wyoming office was performing a pressure test on KLX equipment at a Cannon oil well in Southern Wyoming. The employee

was injured. He then sued Cannon in state court in his home state of Wyoming.

If the Master Agreement's indemnity provision is valid, KLX is ultimately on the hook for injuries suffered by its employee even if Cannon was at fault. So Cannon filed this federal declaratory judgment action seeking to enforce KLX's indemnity obligation for the Wyoming lawsuit.

After the parties filed dueling summary judgment motions, the district court ruled in KLX's favor. The district court first reasoned that the Master Agreement's indemnity provision controls over the Work Order's because of inconsistencies between the two. It then held that the Master Agreement's choice of Texas law does not extend to its indemnity provision because the latter provision contains language recognizing that indemnity could be limited by "applicable law." The court thus concluded that the parties left open the issue of which law would govern their indemnity dispute. Applying Texas choice-of-law rules, the court determined that Wyoming law controlled. Because Wyoming bans oilfield indemnity, the indemnity provision in the Master Agreement was unenforceable.[3] Cannon thus would have to defend itself in Wyoming state court. This appeal followed.

## II.

Cannon first challenges the district court's conclusion that the parties did not decide which state's law would govern their indemnity obligation.

---

[3] Although the district court held that no choice-of-law provision governed, it used the choice-of-law rule for contracts in which there *is* an operative provision. *Compare* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (AM. L. INST. 1971) (governing choice-of-law analysis when parties choose a state whose law will govern), *with id.* § 188 (governing choice-of-law analysis when the parties do not choose a state). The court thus conducted the same analysis that it would have if it had found instead that the parties chose Texas law. Because we hold that the parties did indeed choose Texas law, the district court's inadvertent choice-of-law analysis tracks ours.

No. 21-20115

Resolving this issue depends on whether the Master Agreement exempts its indemnity provision from its general choice of Texas law.

The Master Agreement states that indemnity "shall only be effective to the maximum extent permitted by applicable law, whether by statute or a controlling applicable judicial decision." It further provides that if "any such existing or future law" limits indemnity, the parties' obligation "shall extend only to the maximum extent permitted by such law." KLX convinced the district court that because this language refers to "applicable law" instead of "Texas law," the indemnity provision is not governed by the Master Agreement's general choice-of-law clause. In other words, the "applicable law" clause calls for a different choice-of-law analysis than the rest of the contract.

This argument reads too much into the words "applicable law." The more natural reading is that the Master Agreement recognizes that even under applicable Texas law, indemnity provisions will not always be enforced. *See* TEX. CIV. PRAC. & REM. § 127.003. If existing or future Texas law "limits the extent to which indemnification may be provided," the Master Agreement affirms that the indemnity provision still extends to "the maximum extent permitted by such law." The "applicable law" clause thus is a savings clause that preserves the indemnity provision to the extent allowed by "applicable law," which per the choice-of-law provision is Texas law. *See Ranger Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 78 S.W.3d 659, 663–64 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (example of another indemnity savings clause); *Weber Energy Corp. v. Grey Wolf Drilling Co.*, 976 S.W.2d 766, 767 (Tex. App.—Houston [1st Dist.] 1998) (same). The choice-of-law provision that governs the rest of the Master Agreement therefore also applies to its indemnity provision.

No. 21-20115

On this reading, the Master Agreement and the Work Order are consistent—both contain choice-of-law and indemnity provisions that are not meaningfully different. It does not matter which document controls this dispute because under either the result is the same: Cannon and KLX chose Texas law to govern the scope of their indemnity obligation.[4]

III.

The question becomes whether the parties' choice of Texas law is enforceable for this Wyoming-centered indemnity dispute.

At first blush, the answer may seem straightforward. Courts usually enforce contracts as written. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 48 (1825) (Marshall, C.J.) ("[I]n every forum a contract is governed by the law with a view to which it was made."). Enforcing what the parties bargained for promotes efficiency and certainty. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990).

But when it comes to enforcing a contractual choice-of-law provision, freedom-of-contract values collide with a state's interest in regulating conduct within its borders. State laws regulating contracts would lose much of their bite if parties could oust them by agreeing to apply laws from a favored jurisdiction. *See* SYMEON C. SYMEONIDES ET AL., CONFLICT OF LAWS §§ 18.5–7 (6th ed. 2018) (providing examples of choice-of-law provisions evading consumer protection, employment, franchise, and insurance laws). And if "regulation is desirable, then choice of law creates a race to the bottom by eroding efforts to eliminate social harms." Erin Ann

---

[4] We thus need not decide whether the Master Agreement overrides the Work Order whenever there is an inconsistency between the two or whether the Work Order is instead a "standalone agreement" as Cannon argues.

O'Hara, *Opting out of Regulation: A Public Choice Analysis of Contractual Choice of Law*, 53 VAND. L. REV. 1551, 1571–72 (2000).

Texas's choice-of-law rules, which we apply as a federal court sitting in diversity, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), harmonize this tension. Texas recognizes that "parties can agree to be governed by the law of another state." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014); *see also* TEX. BUS. & COM. CODE § 1.301(a) ("[W]hen a transaction bears a reasonable relation to this state and [another state] the parties may agree that [either law] shall govern their rights and duties."). Numerous Texas cases thus apply the law the parties agreed would govern. *See, e.g.*, *Drennen*, 452 S.W.3d at 331; *Gator Apple, LLC v. Apple Tex. Restaurants, Inc.*, 442 S.W.3d 521, 534–35 (Tex. App.—Dallas 2014, pet. denied); *Mary Kay Inc. v. Woolf*, 146 S.W.3d 813, 817 (Tex. App.—Dallas 2004, pet. denied).

But to account for states' regulatory interests, Texas limits contractual autonomy to choose what law applies. Parties cannot choose the law of a jurisdiction "which has no relation whatever to them or their agreement" nor can they "thwart or offend the public policy of the state the law of which ought otherwise to apply." *DeSantis*, 793 S.W.2d at 677. The result is the conflict-of-laws principle of "limited party autonomy." *Id.* Under it, "although Texas courts permit choice-of-law agreements and the default position is that they are enforceable, it is not uncommon for a party to overcome them." *Cardoni v. Prosperity Bank*, 805 F.3d 573, 581, 586 (5th Cir. 2015) (declining to apply choice of Texas law and applying Oklahoma law to determine validity of noncompete agreements); *DeSantis*, 793 S.W.2d at 681 (declining to apply choice of Florida law and applying Texas law to determine validity of noncompete agreements); *CMA-CGM (Am.), Inc. v. Empire Truck Lines, Inc.*, 416 S.W.3d 495, 516–17 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (declining to apply choice of Maryland law and

applying Texas indemnity law that invalidated agreement);[5] *Panatrol Corp. v. Emerson Elec. Co.*, 163 S.W.3d 182, 189 (Tex. App.—San Antonio 2005, pet. denied) (declining to apply choice of Missouri law and applying Texas law to indemnity issue).

Texas courts look to section 187(2)(b) of the Restatement (Second) of Conflict of Laws to determine whether to enforce a contractual choice of law. *DeSantis*, 793 S.W.2d at 677–78. Under that section, three things must be true for Wyoming law to override the parties' choice of Texas law.

First, Wyoming must have a "more significant relationship" with the parties and transaction than Texas does under section 188 of the Restatement. *Id.* at 678. Second, Wyoming must have a "materially greater interest" than Texas in applying its law to this set of facts. *Id.* Third, applying Texas law must be contrary to a fundamental policy of Wyoming. *Id.*; *see Drennen*, 452 S.W.3d at 325–27 (analyzing a choice-of-law clause using these three steps). Central to these inquiries is each state's interest in the particular substantive issue to be resolved—here, indemnity. *Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000).

---

[5] *CMA-CGM*'s refusal to enforce a choice of law that allowed enforcement of an indemnity agreement disproves Cannon's suggestion that special sanctity is afforded contractual autonomy in the conflicts analysis when indemnity is at issue. So does our decision in *Roberts v. Energy Development Corp.*, 235 F.3d 935 (5th Cir. 2000). There, we declined to enforce a Texas choice-of-law provision and applied Louisiana law even though Texas law would have allowed the indemnity agreement while Louisiana's Oilfield Anti-Indemnity Act would not. *Id.* at 942–44. Although *Roberts* applied Louisiana choice-of-law rules, those largely mirror the Restatement considerations that Texas uses. *See* La. Civ. Code Ann. art. 3540 (stating that the parties' choice of law will apply "except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537"); *id.* art. 3537 (directing courts to consider factors such as "the place of negotiation, formation, and performance of the contract;" the parties' "place of domicile;" and policies including "promoting multistate commercial intercourse" and upholding the parties' justified expectations).

No. 21-20115

A.

To overcome the parties' choice of Texas law, Wyoming must have a "more significant relationship" to Cannon and KLX's indemnity agreement. Put differently, would Wyoming law apply had the parties not chosen Texas?

To answer this question, section 188 of the Restatement directs us to identify the state with the more significant relationship by analyzing various contacts and "their relative importance with respect to the particular issue." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2) (AM. L. INST. 1971). These contacts, specific to contract disputes like indemnity agreements, include:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.* The contacts are weighed "not by their number, but by their quality." *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996).

The section 188 contacts rack up points for Wyoming. Cannon started negotiations by contacting KLX's Wyoming office, and the parties executed the agreements in Wyoming and West Virginia. These place-of-negotiation-and-contracting contacts favor Wyoming and overwhelmingly disfavor Texas. *See DeSantis*, 793 S.W.2d at 679 (finding that Texas had greater contacts to an agreement executed in Houston); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 170 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (discounting Louisiana's relationship to a contract negotiated and executed in Texas and Oklahoma).

The place of performance also favors Wyoming. The Supreme Court of Texas has not decided whether the relevant place of performance in indemnity cases is "where the drilling or the suing takes place." *See Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 234 (Tex. 2008). Intermediate Texas courts take the latter view, explaining that the central act of indemnification occurs in the forum where the personal injury lawsuit is pending. *See Chesapeake*, 94 S.W.3d at 171–72; *Banta Oilfield Servs., Inc. v. Mewbourne Oil Co.*, 568 S.W.3d 692, 711–12 (Tex. App.—Texarkana 2018, pet. denied). The distinction does not matter here as Wyoming is the site of both the drilling and the suing. *See Roberts*, 235 F.3d at 942 (giving significant weight to Louisiana's being the place of performance and location of the injury for which indemnity was being sought).

For services contracts, the "location of the subject matter" largely overlaps with the "place of performance." *See DeSantis*, 793 S.W.2d at 679 ("The place of performance for both parties was Texas, where the subject matter of the contract was located."). So this contact favors Wyoming too. Much of the subject matter of the contract—the physical equipment which could generate an indemnity obligation—was leased in Wyoming and none was in Texas. *DeSantis*, 793 S.W.2d at 679; *CMA-CGM*, 416 S.W.3d at 514 (finding that the location of the subject matter of a general contract governing the transportation of various equipment favored Texas because the equipment at issue was transported entirely within the state).

The only debatable section 188 contact is the principal place of business. Cannon leans on this contact, arguing that it favors Texas because the agreement was drafted by a Texas-based company. But although KLX's principal place of business is in Texas, its Texas presence is negated by Cannon's Wyoming domicile. *See Cardoni*, 805 F.3d at 583 (noting that Texas headquarters of one party were cancelled out by Oklahoma presence of the other).

In trying to tilt the "place of business" factor in its favor, Cannon harps on a seeming anomaly—the Texas company, KLX, is the one arguing that Wyoming law should apply instead of the law of its home state that it selected in the contract. One problem with this is that when determining the state with the most significant relationship, we do not consider the choice-of-law provision; this inquiry is figuring out which state's law would apply in the absence of such an agreement. *Chesapeake*, 94 S.W.3d at 176. Another problem is that nothing in the Restatement or caselaw attaches significance to the fact that a party is trying to avoid its own state's law. Nor do we see sound reason for doing so given that the justification for sometimes overriding the law the parties chose is a concern with intruding on the regulatory authority of the states themselves. RESTATEMENT § 187 cmt. g ("Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation.").

The section 188 contacts thus overwhelmingly favor Wyoming. *See Cardoni*, 805 F.3d at 583 (giving determinative weight in the more significant relationship analysis to the fact that negotiations and place of performance were in Oklahoma); *DeSantis*, 793 S.W.2d at 678–79 (finding that execution of contract and performance of personal services in Texas favored applying Texas law). Four favor Wyoming with one being neutral. None favor Texas.

Understandably, then, Cannon tries to shift focus from the contract-specific section 188 contacts to one of the general conflict-of-laws principles in section 6 of the Restatement.[6] Those "general principles" are the

---

[6] The factors include:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,

background considerations that underlie "the more specific rules" in the Restatement for tort (section 145) or contract (section 188). *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979); *see also* RESTATEMENT § 188 cmt. e ("[T]he forum, in applying the principles of § 6 . . . should give consideration to the relevant policies of all potentially interested states . . . . The states which are most likely to be interested are those which have one or more of the following contacts with the transaction or the parties."). Texas law is unclear on whether we must separately consider the section 6 factors or whether we can instead assume that the section 188 contacts are sufficient "application[s] of the general Section 6 considerations" in the contract context. *Cardoni*, 805 F.3d at 582 n.9; *compare DeSantis*, 793 S.W.2d at 678–79, *and Drennen*, 452 S.W.3d at 326 (neither specifically addressing the section 6 factors), *with Sonat*, 271 S.W.3d at 234–35 (directly considering one of the section 6 factors). But we can assume that we should independently consider the section 6 factors because doing so does not change the outcome.

Cannon invokes the section 6 principle that courts should protect the justified expectations of the parties, which is particularly important in contract cases.[7] *See Sonat*, 271 S.W.3d at 236 (giving decisive weight to the

---

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

[7] The parties do not focus on other section 6 principles like predictability, uniformity, and ease of application. That is likely because they do not counsel strongly in favor of either state. Although "[e]nforcing contracts according to their own terms" enhances predictability and uniformity, *Sonat*, 271 S.W.3d at 235, the "ease of determination and application of law . . . points to applying the law of the state where the injured party brought suit," *Chesapeake*, 94 S.W.3d at 177.

expectations of the parties).  This favors application of Texas law though not emphatically so.  At a basic level, parties that enter a bargain expect to be bound by its terms.  Texas law would allow the indemnity provision; Wyoming law would invalidate it.

And beyond the central fact that Cannon and KLX included an indemnity provision in their contract, there are other indications that they expected to be bound by it.  The Master Agreement's indemnity provision includes a statement of compliance with the "Express Negligence Rule," a Texas rule that requires that contractual indemnity provisions be express and conspicuous.  *See Dresser Indus. Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993).  Moreover, both KLX and Cannon acquired liability insurance coverage as required by the indemnity clause in their agreement.  In *Sonat*, the Texas Supreme Court relied on similar clues and noted that "the parties' expectations as stated in their contract should not be frustrated." 271 S.W.3d at 235; *see also Banta*, 568 S.W.3d at 713 (using the purchase of insurance as a relevant fact in the analysis); *Chesapeake*, 94 S.W.3d at 176 (applying Texas law because "the parties explicitly drafted indemnity provisions and purchased insurance to meet Texas law").

But these clues that Cannon offers to explain the parties' expectations are not as one-sided as they appear on the surface.  For one thing, KLX and Cannon's contract also includes an obligation to acquire liability insurance notwithstanding the insurance obligation in the indemnity provision.  For another, the savings clause we discussed earlier—recognizing that applicable law may operate to limit the indemnity provision—shows that the parties understood that their indemnity provision might not be given full effect.

Although the parties may have had a qualified expectation that their indemnity agreement would be enforced as Texas law allows, other considerations would have led the parties to reasonably expect that Texas law

would not apply.  Parties generally expect that the law of the place of negotiation, contracting, and performance—none of which were Texas here—will govern.  Indeed, in *Sonat*, the case that Cannon relies on to argue that justified expectations should control, the Texas Supreme Court's decision to apply Louisiana law meant not only that the contract would be enforced but also that the law of the place of performance would govern.  271 S.W.3d at 235–36; *see Maxus Expl. Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 57 (Tex. 1991); RESTATEMENT § 196 cmt. c ("Indeed, it can often be assumed that the parties . . . would expect that the local law of the state where the services . . . are to be rendered would be applied to determine many of the issues arising under the contract.").[8]  Accordingly, the parties' expectations do not necessarily favor applying Texas law.

But even if the protection of justified expectations favors applying Texas law, those expectations can be overcome if they are "substantially

---

[8] This is one example of the section 188 contacts as a specific application of the section 6 factors.  Place of contract, negotiation, and performance are relevant considerations because, among other things, they influence the parties' justified expectations.

For similar reasons, another Restatement section creates a presumption in favor of applying the law of the state where "the contract requires that the services, or a major portion of the services, be rendered."  RESTATEMENT § 196; *see also id.* § 188(3) (directing courts to consider certain contract-specific presumptions that appear later in the Restatement, including section 196).  The Supreme Court of Texas reads section 196 as making the place of performance "factor . . . conclusive in determining what state's law is to apply."  *DeSantis*, 793 S.W.2d at 679 (citing RESTATEMENT § 196).  The section 196 presumption, however, applies only when a "major portion of the services called for by the contract is to be rendered in a single state and it is possible to identify this state at the time the contract is made."  RESTATEMENT § 196 cmt. a; *see also Sonat*, 271 S.W.3d at 234 (declining to apply the presumption because no state "loomed large" during negotiations).  Here, the parties arguably knew at the time of contracting that a major portion of the services would be rendered in Wyoming. But because we ultimately conclude that Wyoming law applies under section 187, we need not determine whether it also applies under section 196.

outweighed by the interests of the state with the invalidating rule." *Sonat*, 271 S.W.3d at 235; *see* RESTATEMENT § 188 cmt. b ("Protection of the justified expectations of the parties is a factor which varies somewhat in importance from issue to issue. . . . The extent of the interest of a state in having its rule applied should be determined in the light of the purpose sought to be achieved by the rule and by the relation of the transaction and the parties to that state."). That brings us to other section 6 principles, which ask us to weigh the policies of the relevant states. *See* RESTATEMENT § 6(2)(b), (c). This inquiry, duplicative of the "materially greater interest" analysis we are about to conduct, *see CMA-CGM*, 416 S.W.3d at 517, cuts sharply in Wyoming's favor. As we discuss below, Wyoming's concern that indemnity undermines safety has great force in a dispute seeking indemnification for an injury to one of its residents in one of its oilfields. *See, e.g.*, *id.* at 516 (finding that Texas policies outweighed other considerations including the expectation that Maryland law would apply); *see also Roberts*, 235 F.3d at 942 (finding that Louisiana's anti-indemnity policies outweighed expectation that an indemnity agreement would be enforced when the dispute involved Louisiana subcontractors that the law aimed to protect).

The section 6 principles thus confirm what the contract-specific section 188 contacts decisively recommend. In the absence of a choice-of-law clause, Wyoming law would apply to this indemnity demand for a Wyoming lawsuit brought by a Wyoming resident performing work in the state for a Wyoming company.

## B.

To overcome the parties' contrary choice of Texas law, KLX must next show that Wyoming's interest in this indemnity matter is "materially greater" than Texas's.

No. 21-20115

It easily is.  Wyoming bans oilfield indemnity provisions so that oil and gas companies "internalize the costs of their own operations" and become "more mindful of employee safety."  *Lexington Ins. Co. v. Precision Drilling Co.*, 830 F.3d 1219, 1220 (10th Cir. 2016).  This policy stems from Wyoming's deep experience with the "hazardous undertaking" of drilling and mining.  *Mountain Fuel Supply Co. v. Emerson*, 578 P.2d 1351, 1355 (Wyo. 1978).

Wyoming's interest in promoting worker safety in its oilfields is at its zenith on these facts.  The underlying state court proceeding—in which a Wyoming resident was injured in Wyoming by the alleged negligence of a Wyoming oil company—implicates Wyoming's policy with precision. Enforcing the indemnity provision would discourage what Wyoming hopes to encourage—Cannon's taking steps to avoid injuries in its oilfield operations.

On the other side of the scale, Texas's interest in this dispute is more attenuated.  Its interest in enforcing the contract of one of its businesses is lessened when the contract was not negotiated, drafted, or performed within its borders.  Under these circumstances, Wyoming's interest is materially greater.  *See Cardoni*, 805 F.3d at 584; *CMA-CGM*, 416 S.W.3d at 517.

## C.

KLX must clear one more Restatement hurdle before Wyoming's indemnity ban will govern.  It is not enough that Wyoming has a more significant relationship to the parties and a materially greater interest in applying its policy; its anti-indemnity policy must be "fundamental."  This question "poses a challenge as neither the Supreme Court of Texas nor the Restatement has articulated a clear standard for determining when a policy is 'fundamental.'"  *Cardoni*, 805 F.3d at 585.  But both features of the policies that Texas courts have found fundamental exist here.

No. 21-20115

Wyoming's ban on oilfield indemnification is codified and voids any such agreement as being "against public policy." WYO. STAT. ANN. § 30-1-131. Federal and state courts applying this statute have invalidated indemnity agreements despite the parties' having ties to other states. *See, e.g.*, *Kaiser-Francis Oil Co. v. Noble Casing Inc.*, 2017 WL 1947506, at *5 (D. Wyo. May 10, 2017); *Bolack v. Chevron, U.S.A., Inc.*, 963 P.2d 237, 242 (Wyo. 1998). Because Wyoming "has taken the unusual step of stating [the policy] explicitly" in a statute, *Chesapeake*, 94 S.W.3d at 178, and "will refuse to enforce an agreement" contrary to the policy even when other states connected to the agreement would enforce it, *DeSantis*, 793 S.W.2d at 680, the anti-indemnity policy is a fundamental one.

\* \* \*

Wyoming law applies. Its Oilfield Anti-Indemnity Act does not allow Cannon's claim for indemnification. The judgment of the district court is AFFIRMED.

17